**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **R.J. ANTS, INC.** | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 06-5669** |
| **MARINELLI ENTERPRISES, LLC,** | : | |
| **ET AL.,** | : | |
| **Defendants.** | : | |

## MEMORANDUM

**Tucker, J.**                                                       **February___, 2011**

After a bench trial in this matter on February 22, 2010, and pursuant to Fed. R. Civ. P. 52(a), the Court makes the following Findings of Fact:

## I. FINDINGS OF FACT

### A. Introduction

1. This is an action for trademark infringement brought by Plaintiff, who owns the mark "A Taste of Philadelphia," seeking to enjoin Defendants from using the business name "'A Taste of Philly' Hand Twisted Soft Pretzel Bakery."

2. Plaintiff R. J. Ants, Inc. is a Pennsylvania Corporation with its principal place of business at 1512 Chester Pike, Folcroft, Pennsylvania 19032.

3. Defendant Marinelli Enterprises, LLC is a Delaware Limited Liability Company owned by Defendant Vincent Marinelli, a Pennsylvania resident.

4. Defendant Danielle Marinelli is the spouse of Vincent Marinelli.

5. Defendant Vincent Marinelli is a principal and managing member of Marinelli Enterprises, LLC.

6. Defendant Danielle Marinelli is an officer of Marinelli Enterprises, LLC.

**B.  Plaintiff's Background**

7.      Richard Della Barba is the President and owner of Plaintiff R.J. Ants, Inc.

8.      Plaintiff owns the United States Trademark Registration No. 1,839,752 for the mark "A Taste of Philadelphia", issued on or about June 14, 1994.

9.      Plaintiff  is the successor in interest to the above trademark registration, having received it through assignment from Domenic Della Barba, one of Plaintiff's former shareholders and the brother of the present principal owner Richard Della Barba.

10.     Domenic DellaBarba obtained rights to the mark from the previous owner of the rights to the mark and the business, an individual named Grant Mazmanian.

11.     The mark has been in continuous use by Plaintiff or Plaintiff's predecessors in interest since August 1, 1978.

12.     Plaintiff's mark has been granted incontestable status by the filing of a combined Section 8 & Section 15.

13.     Plaintiff is in the mail and internet gift order business.  It sells and distributes various third-party food products and sundry items native to Philadelphia under the trade name "A Taste of Philadelphia."

14.     Richard Della Barba runs the day to day operations of "A Taste of Philadelphia."

15.     Plaintiff's mark consists of the words "A Taste of Philadelphia." Plaintiff integrates an image of Ben Franklin and the Liberty Bell with his mark.

16.     Plaintiff's telephone number for customers is 1-800-8-HOAGIE.

17.     Plaintiff's website URL is www.tasteofphiladelphia.com.

18.     Plaintiff sells hoagies, cheese steaks, TastyKakes, pretzels, Frank's Black Cherry

Wishniak Soda, Bookbinder's soup, Goldenburg's Peanut Chews, Herr's Chips, scrapple, pork roll, T-shirts and hats combined in different assortments as gift packages via the Internet.

19.     Though Plaintiff's business is primarily Internet-based, Plaintiff also sells cheese steaks, hoagies and beverages to walk-up customers out of its principal and only location in Delaware County.

20.     Unlike Defendant, Plaintiff does not bake its own pretzels onsite. Rather, Plaintiff resells stamped pre-made pretzels from Federal Pretzel Company.

21.     The least expensive of Plaintiff's gift packages is one dozen Amoroso hoagie rolls which costs $46.95. At the midpoint price level of Plaintiff's product offerings is the Standard "original Philly care package" which costs $89.90. The most expensive package Plaintiff offers costs just under $300.00.

22.     Plaintiff advertises on radio, on clear channel taxi media and in regional print magazines using the mark "A Taste of Philadelphia."

23.     Specifically, Plaintiff has targeted advertisements to local customers in Philadelphia Magazine, philly.com, Delaware Valley Magazine and Town Talk magazine.

24.     In addition to radio and print advertisements, Plaintiff has been the lead sponsor in an annual food festival for the city of Philadelphia entitled "A Taste of Philadelphia."[1]

25.     Plaintiff has been the subject of numerous nationally published newspaper articles over the years, including articles published by the Associated Press and other news wire

---

[1] The city of Philadelphia has used and uses the Plaintiff's trademark through a written license between R.J. Ants, Inc. and the city of Philadelphia for an annual food festival featuring the Plaintiff.

services, providing widespread publicity for its use of the mark "A Taste of Philadelphia" in association with its food distribution services.

26. Plaintiff claims that customers have been confused regarding the contested mark.

27. Plaintiff is unable to identify the names of any specific customers or prospective customers who have experienced confusion.

28. The only evidence of confusion offered by Plaintiff regarding the parties' marks are phone logs from March 1, 2006 through January 22, 2010.

29. The phone logs of Plaintiff were kept on advice of counsel.

30. The phone logs indicate that anonymous individuals have mistakenly called Plaintiff while trying to reach one of Mr. Marinelli's pretzel stores.

31. In addition to calls seeking general information, Plaintiff received calls from irrate customers wanting to know why goods they had purchased from the Defendant was not being delivered, apparently believing that the Plaintiff was the company selling them pretzels they had ordered.

32. Plaintiff has taken action against other users of the mark "A Taste of Philadelphia," though Plaintiff admits that is has not taken action against every infringer located throughout the country.

33. For example, Plaintiff successfully filed an action to oppose a registration application for a caterer in the state of California whose mark included the phrase "Bringing a Taste of Philly to You."[2]

34. Federal income tax returns show that from 2001 through 2006, Plaintiff has not made a

---

[2] See U.S. Trademark Trial and Appeals Board Opposition No. 91182066.

profit.

35.    Plaintiff's main competitor is Joe Kubicky who manages a mail order business that ships

Philadelphia type foods around the county, in a similar fashion to "A Taste of

Philadelphia", under the name "Philly Foods" utilizing the URL website address of

www.atasteofphilly.com.

36.    Plaintiff is not in the business of franchising "A Taste of Philadelphia."

37.    Plaintiff used to license its mark to Welcome America, Inc. until Welcome America, Inc.

registered its own mark "Taste of Philadelphia."

38.    Mr. Della Barba is unaware of any damages that he sustained due to Defendants' actions.

39.    Plaintiff maintains that the use of the mark A Taste of Philly for the Defendants' business

establishment is likely to cause confusion among relevant consumers of

Philadelphia-style soft pretzels because each party uses their mark in association with,

among other foods native to Philadelphia, soft pretzels.

40.    Plaintiff believes that when compared together, the term A Taste of Philadelphia, in the

minds of the public, will be taken to be identical to the term A Taste of Philly because the

slang word Philly is widely known and accepted by the public at large to mean

Philadelphia.

41.    The Plaintiff itself has used the word "Philly" for the word "Philadelphia" in some

advertisements.

42.    Some of Plaintiff's customers have referred to the Plaintiff as "A Taste of Philly."

**C.  Defendant's Background**

43.    Mr. Marinelli began his retail operations in or about 2005.

44. Mr. Marinelli is in the business of selling hand-made soft pretzels and other pretzel related items, soft drinks and pretzel making kits primarily from store front buildings.

45. Marinelli is also in the business of franchising stores that sells hand-made soft pretzels.

46. Marinelli first used the mark "A Taste of Philly" Hand Twisted Soft Pretzel Bakery in 1999 in connection with its store in Doylestown, Pennsylvania. Marinelli's other pretzel stores and associated franchises continue to use this mark.

47. When Mr. Marinelli began his business, he sometimes referred to his business as "A Taste of Philly", and for several years, he did so without comment from Plaintiff.

48. Mr. Marinelli approached Mr. Della Barba in August of 2005 to enter into a coexistence agreement for purposes of resolving any potential liability issues by third parties arising out of the use of the names "A Taste of Philadelphia" or "A Taste of Philly."

49. Mr. Marinelli had legal papers prepared by his lawyer and was under the impression that the legal documents would protect both Plaintiff and Defendant in case third party liability issues arose.

50. Plaintiff did not agree to enter into the agreement.

51. Mr. Marinelli moved forward with his business because he felt his mark and his business were different from Plaintiff's and because he believed he did not need Mr. Della Barba's permission to do so.

52. Marinelli's mark consists of the words "A Taste of Philly" in quotation marks above the image of a pretzel with the words "Hand Twisted Soft Pretzel Bakery" underneath the pretzel.

53. Marinelli owns the mark "Hand Twisted Soft Pretzel Bakery" and is currently in the

process of registering the mark with the trademark office.

54.    Mr. Marinelli purchased the mark "A Taste of Philly" Hand Twisted Soft Pretzel Bakery

from Brad Wenodau and Steven Nuel in 1999.

55.    Mr. Marinelli sells hand twisted fresh baked pretzels on premises at each one of his

stores.

56.    Mr. Marinelli does not ship his pretzels.

57.    Mr. Marinelli occasionally hosts children's birthday parties at his stores.

58.    Mr. Marinelli does not have an active website.

59.    Mr. Marinelli's former website URL was www.atasteofphillybakery.com.

60.    The average sale at a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store is

approximately $4.00.

61.    Defendant's menu also offers pretzel party trays and bulk orders of pretzels that range in

price from $10.00 to $35.00.

62.    The average customer profile for "A Taste of Philly" Hand Twisted Soft Pretzel Bakery

store is an individual off the street seeking a fresh baked hot pretzel.

63.    Defendant's advertisements appear mostly in local community outlets and Mr. Marinelli

spends approximately $15,000 per year on advertising.

64.    The franchisees are responsible for their own advertising. The franchisees spend

approximately $3,000 per year on advertising.

65.    In or about 2005, Marinelli entered into a consulting agreement to provide equipment,

training, installation, professional fees and build out for a "A Taste of Philly" Hand

Twisted Soft Pretzel Bakery store in Towson, Maryland in exchange for approximately

$165,000.  A monthly fee that was supposed to be paid to Marinelli by the owner of the

Townson, Maryland has never materialized.

66.     Mr. Marinelli is a part owner of ATOP-DB, LLC which owns a "A Taste of Philly" Hand

Twisted Soft Pretzel Bakery store in Feasterville, Pennsylvania. The Feasterville store

began operation in or about 2005 or 2006. Mr. Marinelli receives 30% of the profits of

this store. This store showed a profit of $3,380.00 in 2008.

67.     Mr. Marinelli opened a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in

Langhorne, Pennsylvania in approximately 2005. The Langhorne store was owned by Mr.

Marinelli and two other partners. The Langhorne store has since closed due to lack of

business.

68.     Mr. Marinelli opened a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in

Southhampton, Pennsylvania in approximately 2006 which was owned by ATOP

Southampton, LLC. Mr. Marinelli sold the Southhampton store to Twisted Sisters LLC

for $355,000 which includes the property, equipment, training, professional fees and

franchise license. Twisted Sisters LLC has not paid Mr. Marinelli the $1,000.00 per

month franchise fee on a regular basis.

69.     Mr. Marinelli opened a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in

Glenside, Pennsylvania which remains open today. Mr. Marinelli owns 51% of the store

while John Thompson owns 49%. Both John Thompson and Mr. Marinelli invested

money into the store which went to equipment, training, installation, professional fees

and build out of the space. A franchise agreement was never executed with regard to the

Glenside store and Marinelli is not receiving the $1,000 monthly franchise fee due to lack

of business.

70. In or about 2006, Mr. Marinelli opened a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Bensalem, Pennsylvania which remains open today. The owner of the Bensalem store is ATOP – Bensalem, LLC. ATOP – Bensalem, LLC is owned by Mr. Marinelli, John Thompson and Darren Ebner. The three owners invested approximately $150,000.00 into the Bensalem store which went to equipment, training, installation, professional fees and build out of the space. The store loses money every day and it is for sale.

71. In or about 2008, Mr. Marinelli opened a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Souderton, Pennsylvania which remains open today. The owner of the Bensalem store is ATOP – Souderton, LLC. Mr. Marinelli owns 51% of ATOP – Souderton, LLC and Craig Phillips owns 49%. The owners invested money into the Souderton store which went to equipment, training, installation, professional fees and build out of the space. Mr. Marinelli's K-1 tax return for ATOP-Souderton shows a loss of $2,449 for 2008.

72. Mr. Marinelli assisted with the opening of a pretzel store in Indianapolis. The Indianapolis store uses Marinelli's mark though it is not a franchise. Marinelli received a minimal consulting fee in exchange for consulting services.

73. Mr. Marinelli is attempting to sell any and all interest he has in the pretzels stores because they are losing money.

74. Mr. Marinelli does not consider Plaintiff a competitor as Plaintiff is engaged in a mail order business that sells a conglomeration of Philadelphia foods at marked up prices

while Marinelli and the franchises sell freshly made pretzel items and beverages to customers off the street.

75. ATOP- DB, LLC, ATOP Souderton, LLC, ATOP – Bensalem, LLC and ATOPSouthampton, LLC are not defendants in this action.

76. Marinelli has sold approximately thirteen (13) franchises with the name "A Taste of Philly" Hand Twisted Soft Pretzel Bakery.

77. None of the franchisees are named defendants in this matter.

78. Marinelli customarily charges a fee of $145,000-165,000 to franchise a store along with a monthly royalty fee of approximately $1,000.00 while the store remains in business.

79. The franchise and royalty fee pays for the bakery's equipment, transportation of the equipment, start up and continuing training of staff and employees, professional fees, installation and build out of the stores, and ongoing maintenance and franchise issues.

80. In or about 2005, Mike Eigen paid Marinelli a $155,000 franchise fee to open "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Havertown, Pennsylvania. The fee paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. Marinelli was also supposed to receive $1,000 royalty per month as a franchise fee. The monthly franchise royalty fee was paid to Marinelli for only seven months. The Harvertown store closed in or about 2007.

81. In or about 2006, Rob Kerrigan paid Marinelli a $165,000 franchise fee to open "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Bristol, Pennsylvania. The fee paid for the bakery's equipment, transportation of the equipment, training of staff and

employees, professional fees and installation and build out of the store. Only three payments of the $1,100 franchise royalty fee were paid to Marinelli before the Bristol store went of business.

82.     In or about 2005, Jason Matthews paid Marinelli a $90,000 franchise fee to open "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Dublin, Pennsylvania.  Mr. Marinelli paid the reminder of the funds necessary to start the store. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. Only three payments of the $1,100 franchise fee were paid to Marinelli when the Bristol store went of business. The Dublin store is for sale and remains in a state of distress.

83.      In or about 2005, Jim Herring paid Marinelli a $127,000 franchise fee to open "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Richboro, Pennsylvania. Mr. Marinelli paid the reminder of the funds necessary to start the store. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. No royalty fees were received and the store has since been sold to a third-party who does not pay any royalty fees.

84.     In or about 2009, Mike Frandak in his capacity as a managing member of AMCT, LLC executed a consulting agreement with Marinelli and paid a $155,000.00 franchise fee to open "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Chestnut Hill, Pennsylvania. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build

out of the store. This franchisee paid its royalty fee for approximately six months and has since ceased payment.

85.     In or about 2008, Gail Burke paid Marinelli a $155,000 franchise fee to open "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Dresher, Pennsylvania. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. This franchisee paid its royalty fee for approximately six months and has since ceased. This store has since closed.

86.     In or about 2007, Dave and Brian Swetzer paid Marinelli approximately $165,000 toward a franchise fee to open "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Haddonfield, New Jersey which remains open today. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. This franchisee paid its royalty fee of $1,100.00 sporadically.

87.     In or about 2008 ATOP – Newtown, LLC through its managing member Chris Fachetti paid Marinelli approximately $200,000 toward a franchise fee to open a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Newtown, Pennsylvania which remains open today. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. This franchisee pays its royalty fee of $1,000.00 for approximately 2 months and has now closed.

88.     In or about 2008, Bill McClusky paid Marinelli approximately $175,000 toward a

franchise fee to open a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Rio Grande, New Jersey which remains open today. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. This franchisee pays its royalty fee of $1,100.00 though the payments are sporadic.

89. In or about 2008, Ron and Laura Owens paid Marinelli approximately $150,000 toward a franchise fee to open a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Willingsboro, New Jersey. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. This franchisee pays its royalty fee of $1,100.00 however payments have been sporadic.

90. In or about 2008, Mark Rossi paid Marinelli approximately $150,000 toward a franchise fee to open a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Willingsboro, New Jersey. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. This franchisee has not been paying the royalty fees.

91. In or about 2008, Marinelli received approximately $150,000 toward a franchise fee to open a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Woodbury, New Jersey. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. This franchisee paid royalty fees for approximately two (2) months and has since ceased.

92. In or about 2009, Dan Fry paid Marinelli approximately $150,000 toward a franchise fee to open a "A Taste of Philly" Hand Twisted Soft Pretzel Bakery store in Lehigh Valley, Pennsylvania. These initial funds paid for the bakery's equipment, transportation of the equipment, training of staff and employees, professional fees and installation and build out of the store. This franchisee has paid approximately one month in royalty fees.

93. Mr. Marinelli and Mrs. Marinelli do not have the resources to pursue non-payment of franchise royalties.

94. Mr. and Mrs. Marinelli show a combine loss of $25,164.00 on their 2005 federal income tax return.

95. Mr. and Mrs. Marinelli's 2006 federal income tax return shows Marinelli Enterprises LLC with a loss of $4,968.00.

## II.  CONCLUSIONS OF LAW

96. Federal claims for trademark infringement and unfair competition are governed by the Lanham Act, 15 U.S.C. §§1051, et. seq.

97. The purpose of the Lanham Act is to make "actionable the deceptive and misleading use of marks" and to "protect against unfair competition."  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-68 (1992) (quoting 15 U.S.C. § 1127).

98. To prevail on a claim for trademark infringement and unfair competition under the Lanham Act, a plaintiff must establish the following three elements: 1) that the mark is valid and legally protectable; 2) that the plaintiff owns the mark; and 3) that the defendant's use of the mark is likely to cause confusion.  Kos Pharms, Inc. v. Andrx Corp., 369 F.3d 700, 711 (3d Cir. 2004).

99.   A Pennsylvania common law cause for unfair competition is identical to the Lanham Act, without the federal requirement of interstate commerce. <u>Moore Push-Pin Co. v. Moore Business Forms, Inc.</u>, 678  F. Supp. 113, 116 (E.D. Pa. 1987); <u>Allen-Myland v. Intl Bus. Machines Corp.</u>, 746 F. Supp. 520, 553 (E.D. Pa. 1990).

100.  Here, the parties do not contest that Plaintiff's mark "A Taste of Philadelphia" is valid and legally protectable; nor do the parties contest Plaintiff's ownership of the mark.

101.  Thus, the critical question before the Court is whether Defendant's "A Taste of Philly Hand Twisted Soft Pretzel Bakery" would likely cause confusion in the mind of the typical consumer. That is, whether the typical consumer viewing Defendant's "A Taste of Philly Hand Twisted Soft Pretzel Bakery" mark would assume the products and services it represents is associated with Plaintiff's mark "A Taste of Philadelphia."

## A.  LIKELIHOOD OF CONFUSION ANALYSIS

102.  The Third Circuit has identified ten factors to be considered when determining whether a likelihood of confusion exists:

  a.   The degree of similarity between the owner's mark and the alleged infringing mark;

  b.   The strength of owner's mark;

  c.   The price of the goods and other factors which indicate the care and attention expected of consumers when making a purchase;

  d.   The length of time the defendant has used the mark without evidence of actual confusion arising;

  e.   The intent of the defendant in adopting the mark;

f.     The evidence of actual confusion;

g.     Whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same channels of trade and advertised through the same media;

h.     The extent to which the targets of the parties' sales efforts are the same.

i.     The relationship of the goods in the minds of the public because of the similarity of function; and

j.     Other facts suggesting that the consuming public might expect the prior owner to manufacture in the defendants' market.

Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1982).

103.     "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other." Checkpoint Sys., Inc.v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001).

104.     The Lapp test need not be "followed precisely so long as the relevant comparisons suggested by the test are made." A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 207 (3d Cir.2000).

105.     The district court must, however, provide an explanation for any of the Lapp factors that it finds inapplicable or unhelpful. Id. at 214 n. 8.

**First Factor - Plaintiff and Defendant's Marks Are Not Similar**

106.     The first element, similarity of the marks, is one of the most probative and critical elements in the confusion analysis. See Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472-73 (3d Cir.1994); Opticians Ass'n v. Indep. Opticians, 920 F.2d 187,

195 (3d Cir. 1990).

107.　Marks are considered similar if they "create the same overall impression when viewed separately." A & H Sportswear, Inc., 237 F.3d at 216.

108.　Marks are confusingly similar if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection or sponsorship. Id.

109.　In assessing the degree of similarity between two marks, courts should "compare the appearance, sound and meaning of the marks." Checkpoint, 269 F.3d at 281.

110.　With respect to the appearance of the marks, the Court finds that the marks are dissimilar.

111.　Plaintiff's mark depicts an image of the Liberty Bell with the words "A Taste of" above the image and the word "Philadelphia" beneath the image. At the bottom of the mark is a picture of Ben Franklin holding a hoagie.

112.　Defendant's mark depicts an image of a pretzel with the words "A Taste of Philly" in quotation marks above the image and the words "Hand Twisted Soft Pretzel Bakery" beneath the image. The wording in Defendant's mark is lower-case, with only the first letter of each word capitalized.

113.　With respect to the sound of the marks, the Court finds that "A Taste of Philadelphia" and "A Taste of Philly" Hand Twisted Soft Pretzel Bakery have different auditory impressions.

114.　Though both marks begin with the phrase "A Taste of", Plaintiff's mark contains eight syllables ending with the word Philadelphia, whereas Defendant's mark contains fourteen syllables and ends with the word Bakery.

115.　Lastly, the court finds that the meanings of the two marks are different.

116. The phrase"A Taste of Philadelphia," which comprises all of the wording in Plaintiff's mark does not allude to one specific product, rather, it implies food items with some connection to the Philadelphia area. Combined with the image of the hoagie, however, Plaintiff's mark suggests that the product being offered may be a Philadelphia-style sandwich. Based on the Plaintiff's mark alone, however, it is not clear whether other products or services are offered.

117. Defendant's mark unequivocally conveys a more specific product offering because it contains the descriptive term "soft pretzel bakery" and also contains the image of a pretzel.

118. Taken as a whole, the Court finds that the two marks are distinct in sight, sound, and meaning and therefore would not be confusingly similar to the ordinary consumer.

**Second Factor –Plaintiff's Mark Is Weak**

119. The second factor to be analyzed in the confusion analysis is the strength of Plaintiff's mark.

120. "The strength of the mark measures the mark's distinctiveness and its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." W.L. Gore & Associates v. Johnson & Johnson, 882 F. Supp. 1454, 1459 (D. Del. 1995) (internal citations omitted).

121. "A strong mark is one which carries immediate, widespread recognition of one producer as associated with that product." Strike Holdings LLC v. UC Strikes, LLC, 2005 WL 1799412, *6 (E.D. Pa. July 28, 2005) (citing Checkpoint, 269 F.3d at 282).

122. "The strength of a trademark can range from weak to strong; the stronger the mark, the

greater the trademark protection it is afforded." Id.

123.  To determine the strength of a mark, the court must conduct a two-part inquiry into both "(1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition." Id. (citing Checkpoint, 269 F.3d at 282; A & H Sportswear, Inc., 237 F.3d at 221).

### A. Plaintiff's mark lacks conceptual strength

124.  The first prong of the test to determine the strength of a plaintiff's mark - conceptual strength - looks to the inherent features of the mark. Strike Holdings LLC v. UC Strikes, LLC, 2005 WL 1799412, at *6.

125.  To determine the conceptual strength of a mark, the court must place the mark in one of the following four categories on the distinctiveness spectrum: 1) generic (e.g., diet chocolate fudge or Aspirin); 2) descriptive (e.g., security center); 3) suggestive (e.g., coppertone); and 4) arbitrary or fanciful (e.g., kodak). A & H Sportswear, Inc., 237 F.3d at 221.

126.  A term is generic if it functions as the common descriptive name of a class of products. A.J. Canfield Co. v. Honickman, 808 F.2d 291, 297 (3d Cir. 1986).

127.  A descriptive term used as a mark conveys an immediate sense of the ingredients, qualities, or characteristics of goods bearing that mark. Id.

128.  A suggestive mark requires consumer imagination, thought, or perception to determine what the product is. Id.

129.  An arbitrary or fanciful mark bears no logical or suggestive relation to the actual characteristics of the goods bearing the mark. Id. at 296.

130. "In classifying a mark, the Court does not look to the intent of the party choosing that mark. Instead, the impact of the mark on the minds of prospective consumers is controlling." <u>Rockland Mortg. Corp. v. Shareholders Funding, Inc.</u>, 835 F. Supp. 182, 189 (D. Del. 1993).

131. Because the parties have not provided the Court with evidence of how consumers in their particular market interpret the meaning of the "A Taste of Philadelphia" mark, the Court must step into the minds of consumers and determine the message.

132. Plaintiff's mark "A Taste of Philadelphia" is used in connection with its sale and distribution of gift baskets of different foods native to Philadelphia including Philadelphia-style hoagies, soft pretzels, Frank's brand sodas, and TastyKakes.

133. The Court finds that Plaintiff's mark is not generic because "A Taste of Philadelphia" is not a common descriptive name of the class of products that Plaintiff distributes. Nor is Plaintiff's mark arbitrary or fanciful because as explained below, it does bear a logical relation to the goods bearing the mark.

134. Plaintiff's mark most likely falls somewhere along the suggestive to descriptive range along the distinctiveness spectrum.

135. To a typical consumer, the mark's inclusion of the wording "A Taste of" conveys an immediate sense that the products associated with the mark are food items. When used in connection with the word Philadelphia, a typical consumer would logically conclude that goods bearing the mark are food items native to or prepared in the Philadelphia area.

136. For this reason, the Court believes that the term more appropriately falls in the descriptive category rather than the suggestive category as it is arguable that no imagination is

required for a potential consumer to reach a conclusion about the nature of plaintiff's product or services.

137.	Descriptive terms are protected only if they achieve secondary meaning in the minds of the consuming public.  <u>Checkpoint</u>, 104 F. Supp. 2d at 458.

138.	Secondary meaning is acquired when the mark is "not only an identification of the product or services, but also a representation of the origin of those products or services." <u>Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.</u>, 214 F.3d 432, 438 (3d Cir. 2000) (quoting <u>Scott Paper Co. v. Scott's Liquid Gold, Inc.</u>, 589 F.2d 1225, 1231 (3d Cir. 1978)).

139.	That is, a term that has achieved secondary meaning identifies "the source of the product rather than the product itself."  <u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>, 456 U.S. 844, 851 n. 11 (1982).

140.	When determining whether a disputed mark has achieved secondary meaning, the Third Circuit has articulated the following factors for consideration: (1) the extent of sales and advertising leading to consumer association; (2) the length of the mark's use; (3) the exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion.  <u>See</u> <u>Commerce Nat'l</u>, 214 F.3d at 438.

141.	The following facts support a secondary meaning finding: (1) Plaintiff's mark has been in continuous use by Plaintiff or Plaintiff's predecessors in interest since August 1, 1978 and has been registered with the United States Trademark Office since June 14, 1994; (2)

Plaintiff has been the lead sponsor in an annual food festival for the city of Philadelphia entitled "A Taste of Philadelphia" (and for which the city obtained a license from Plaintiff to use); (3) three separate national news articles have featured Plaintiff's business over the past decade; and (4) since 2004, Plaintiff has received phone calls from members of the public attempting to reach other businesses such as Defendant's business.

142.   The following facts, however, do not weigh in favor of a finding that Plaintiff's mark has achieved a secondary meaning: (1) tax return records spanning from 2001 to 2006 indicate that Plaintiff has at most spent just over $11,000 a year on print and radio advertisements[3]; (2) several entities throughout the country use "A Taste of Philadelphia" or "A Taste of Philly" as descriptive terms for food services and products[4] demonstrating that Plaintiff does not exclusively use the mark; (3) the record does not include any customer survey data to support a secondary meaning finding; (4) Plaintiff has not identified any trade journals indicating that the mark has acquired secondary meaning; and (5) Plaintiff's business is quite modest as evidenced by the facts that Mr. Della Barba runs the daily operations of the business himself, the record does not indicate that there are any other employees, Plaintiff's company has never shown a profit, and the record does not contain evidence of Plaintiff's sales volume or number of customers served.

---

[3] During the bench trial, Plaintiff testified that advertising expenditures were valued at $40,000 to $50,000 per year during the relevant time period if the figure included the value of merchandise that Plaintiff traded for advertising spots in lieu of cash payments. This testimony and the records itself demonstrate that evidence related to the amount of money Plaintiff spent on advertising is inconclusive.

[4] For example, in Syracuse, New York a restaurant called "A Taste of Philadelphia" sells cheesesteaks and other Philadelphia style foods and advertises on the internet. (Def. Ex 32.) In Denver, Colorado a restaurant called "Taste of Philly" sells cheese steaks and other Philadelphia-styled foods and advertises on the internet. (Def. Ex 34.) In Monson, Massachusetts a restaurant called "Salerno' Taste of Philadelphia sells Philadelphia based foods and advertises on the internet. (Def. Ex 36.) And in Philadelphia, Pennsylvania, Reading Terminal Market publicizes and hosts a well known food tour entitled "A Taste of Philly" Food Tour on the internet. (Def. Ex 48.)

143. Based on the foregoing, the Court concludes that the balance of the evidence weighs against a finding that a secondary meaning has attached to Plaintiff's mark.

144. Plaintiff's mark, therefore, appears to lack conceptual strength.

145. This conclusion is further bolstered by the fact that courts in this district have routinely held that geographically descriptive marks are not protected under the Lanham Act. See e.g., Lamberti v. Positano Ristorante, Inc., 2005 WL 627975, at *4 (E.D. Pa. Mar. 16, 2005) (assessing the mark "Positano Ristorante" and concluding that "Positano" is a city on Italy's Amalfi Coast known for its Italian and Mediterranean cuisine and that such geographic terms are not protected by the Lanham Act).

### *B. Plaintiff's mark lacks commercial strength*

146. The second prong of the test to determine the strength of a plaintiff's mark - commercial strength - focuses on factual evidence of recognition in the marketplace. Strike Holdings LLC v. UC Strikes, LLC, 2005 WL 1799412, at *6.

147. Evidence on this prong can include money expended on advertising, trends in purchases and other indicators of recognition by consumers. Id. (citing A & H Sportswear, Inc., 237 F.3d at 224.)

148. Additionally, evidence of third party uses of a plaintiff's mark is indicative of the mark's lack of commercial strength in the marketplace and its conceptual commonality. See QVC, Inc. v. HSN LP, 2006 U.S. Dist. LEXIS 28940, *8 (E.D. Pa. May 11, 2006).

149. Plaintiff's target market appears to be customers who live outside of the Philadelphia-area and therefore do not have local, readily available access to foods native to Philadelphia.

150. As aforementioned, Plaintiff has advertised its services on the internet and in various

publications, and Plaintiff has provided evidence of advertising expenditures and recognition in local and regional publications.

151. While Mr. Della Barba testified that Plaintiff spent considerable amount of money on advertising, his federal income tax returns reflected that he spent significantly less than what he testified to. In 2006, for example, Plaintiff expended $0.00 on advertising. It appears that the bulk of the advertising "expenditures" actually describes Plaintiff's practice of acquiring advertising spots in exchange for Plaintiff's goods.

152. Finally, the record evidence shows that there are many restaurants, organizations, and events that use "A Taste of Philadelphia" or "A Taste of Philly" as part of their business names both regionally and across the country.

153. For example, in Syracuse, New York a restaurant called "A Taste of Philadelphia" sells cheesesteaks and other Philadelphia style foods and advertises on the internet. In Denver, Colorado a restaurant called "Taste of Philly" sells cheese steaks and other Philadelphia Styled foods and advertises on the internet. In Monson, Massachusetts a restaurant called "Salerno' Taste of Philadelphia sells Philadelphia based foods and advertises on the internet. And in Philadelphia, Pennsylvania Reading Terminal Market publicizes and hosts a well known food tour entitled "A Taste of Philly" Food Tour on the internet. The web page for this tour is www.tasteofphillyfoodtour.com.

154. These facts combined with the fact that Plaintiff has not turned a profit over the past several years suggests that Plaintiff's breadth of sales and reputation within its industry are lacking and further suggests that its mark is not particularly well known in the public's eye.

155. Because the Court finds that Plaintiff's mark lacks both conceptual and commercial strength, the Court concludes that Plaintiff's mark is weak.

**Third Factor – The Parties Sell Different Products At Different Price Points**

156. The third <u>Lapp</u> factor weighs against finding a likelihood of confusion "[w]hen consumers exercise heightened care in evaluating the relevant products before making purchasing decisions." <u>Checkpoint</u>, 269 F.3d at 284.

157. To assess this factor, courts will consider the price of the goods and the sophistication of the buyer; if goods are expensive, or there is evidence that the average buyer exercises a certain level of care in making the purchase, or is a professional or commercial consumer, confusion is deemed less likely. <u>Strike Holdings LLC v. UC Strikes, LLC</u>, 2005 U.S. Dist. LEXIS 15398, at *18.

158. The amount of care and attention given to a purchasing decision increases proportionately as the cost of the goods or services increase. <u>See Restaurant Lutece, Inc. v. Houbigant, Inc.</u>, 593 F. Supp. 588, 595 (D.N.J. 1984); 3A Callmann, Unfair Competition, Trademarks & Monopolies §§20.09, 20.10.

159. Conversely, confusion is more likely where goods are inexpensive and as a result are likely to be purchased without careful consideration. <u>Magnaflux Corp. v. Sonoflux Corp.</u>, 231 F.2d 669 (1956).

160. Different price points make confusion less likely, because the parties' goods will be purchased by different classes of consumers. <u>See</u> 4 McCarthy § 24:52.

161. Plaintiff sells hoagies, cheese steaks, TastyKakes, pretzels, Frank's Black Cherry Wishniak Soda, Bookbinder's soup, Goldenburg's Peanut Chews, Herr's Chips, scrapple,

pork roll, T-shirts and hats in bundled gift packages via overnight mail. Though the individual products themselves may be inexpensive, when collectively packaged in a gift package and shipped overnight, the price for such goods is relatively expensive.

162. Plaintiff does not focus the sale of its gift packages over the counter at retail outlets. Instead, Plaintiff sells its gift package by phone or through the Internet. Plaintiff does sell sandwiches over the counter from its one location.

163. Plaintiff's least expensive package is one dozen Amoroso Rolls priced at $46.95. Plaintiff's standard "original Philly care package" costs $89.90. Plaintiff offers other packages at even higher prices.

164. Defendant's business entails selling in its retail outlets only pretzels and pretzel-based products to the general public primarily coming off the street at a significantly lower cost.

165. The average sale at a "'A Taste of Philly' Hand Twisted Soft Pretzel Bakery" store is approximately $4.00.

166. The markedly higher price of Plaintiff's items suggests that Plaintiff's consumers are likely to be of a higher sophistication level than Defendant's consumers, or at a minimum would tend to exercise more care in evaluating the relevant products before making a purchasing decision.

167. Further supporting this distinction between the parties' consumers is the fact that the only product offered by both Plaintiff and Defendant are pretzels. Defendant's pretzels, however, are fresh baked and hand twisted at the retail stores, while Plaintiff does not make its own pretzels but sells pre-packaged and stamped pretzels made by Federal Pretzel Company.

168. In more contrast, the consumers of Plaintiff's services and products are primarily out of state, while the consumers of Defendant's products are local consumers since Defendant does not ship its products through the mail.

169. Based on the product offerings and the divergence in price points between Plaintiff's gift baskets and Defendant's retail-location pretzel sales, the cross section of customers buying Plaintiff's goods and services do not overlap with those buying Defendant's goods in any significant way.

170. These facts demonstrate that Plaintiff's customers likely pay more care and attention to their purchases of Plaintiff's products than do Defendant's customers, who probably make purchases of Defendant's products with significantly less consideration.

171. Accordingly, the Court finds that Plaintiff's and Defendant's distinct channels of trade, dissimilar pricing practices, and different classes of consumers weigh against a finding of consumer confusion.

**Fourth and Sixth Factors – The Parties' Marks Have Coexisted For Several Years With Some Evidence of Actual Confusion**

172. The fourth element concerns the length of time defendant has used the mark without evidence of actual confusion arising. "The length of use varies inversely with the likelihood of confusion. That is, if a party has used a certain mark for years without any consumers being confused about the source of its services, there is a strong inference that future consumers will not be confused either." Rockland Mortg. Corp. v. Shareholders Funding, Inc., 835 F. Supp. at 194 (citing Scott Paper Co., 589 F.2d at 1230 (finding no likelihood of confusion in part because "defendant's mark had been utilized ... for over

forty years without any evidence of actual confusion")). <u>See also</u> <u>Strike Holdings LLC v.</u> <u>UC Strikes</u>, LLC, 2005 U.S. Dist. LEXIS 15398, at *23 (finding that the longer the period without actual confusion the less likely it is that confusion will ever result).

173. "While proof of actual confusion is 'often deemed the best evidence of possible future confusion,' it is not considered essential." <u>Alliance Bank v. New Century Bank</u>, 2010 WL 2991204, at * 25 (E.D. Pa. July 27, 2010) (internal citations omitted).

174. In fact, the Third Circuit has recognized that evidence of actual confusion "is difficult to find ... because many instances are unreported." <u>Checkpoint</u>, 269 F.3d at 291.

175. Without knowing how many, or what percent of, incidents go unreported, anecdotal evidence of confusion cannot usefully be compared to the universe of potential incidents of confusion. The rarity of such evidence makes even a few incidents "highly probative of the likelihood of confusion." <u>Checkpoint</u>, 269 F.3d at 291 (Because "reliable evidence of actual confusion is difficult to obtain in trademark and unfair competition cases, any such evidence is substantial evidence of likelihood of confusion.") (quotation omitted ).

176. The only evidence of actual confusion at issue in this matter are the misdirected phone calls received between March 2006 and January 2010 and described in Plaintiff's phone logs.

177. The length of time over which the Plaintiff has received misdirected calls appears to favor Plaintiff because Defendant began operating its retail locations in 2005 and according to Plaintiff, Plaintiff began receiving calls from consumers attempting to reach Defendant shortly thereafter.

178. That said, courts have frequently held that evidence of actual confusion must be more

than de minimis.  2 McCarthy § 23.02[2][b] (citing <u>Everest & Jennings, Inc. v. E & J</u>

<u>Mfg. Co.</u>, 263 F.2d 254 (9th Cir.1958), cert. denied, 360 U.S. 902, 79 S.Ct. 1284, 3

L.Ed.2d 1254 (1959)).  In addition, courts must find a causal connection between the use

of similar marks and instances of actual confusion.  <u>Id.</u> at § 23.02[2][a].

179.  Moreover, the Third Circuit has held that the probative value of misdirected

communications decreases when the Court cannot tell whether the mistake resulted from

the author's confusion of the parties' similar marks or from inadvertence.  <u>See</u>

<u>Checkpoint</u>, 269 F.3d at 298.  <u>See also</u> <u>Duluth News-Tribune v. Mesabi Publ'g Co.</u>, 84

F.3d 1093, 1098 (8th Cir.1996) (misdirected communications that are not a result of the

sender's confusion of the parties' marks are not evidence of actual confusion).

180.  Since Marinelli began operating his business in 1999, he claims that he has not noticed or

been informed about any actual confusion between Plaintiff's and Defendant's marks

among the general public.

181.  Plaintiff claims otherwise and argues that he has received hundreds of anonymous calls

from individuals looking for Defendant's business, particularly since Defendant began

operating its retail locations.

182.  As aforementioned, Plaintiff's only evidence of confusion besides Mr. Della Rosa's

testimony during trial are self-prepared phone logs documenting the numerous phone

calls from individuals mistakenly contacting Plaintiff's business while purportedly trying

to reach Defendant's business.

183.  Based on the sheer volume of the calls recorded from March 2006 through January 2010

alone, the Court concludes that *some* actual confusion over the parties' marks exists.

Such evidence of misdirected calls is entitled to some indicia of a likelihood of confusion.

184. That established, for a couple of reasons, the Court finds that the probative value of the misdirected calls must be called into question. First, it is not clear whether customers listed were actually confused by the parties' marks or were misdirected to Plaintiff for some unknown reason as there is no evidence in the record to shed insight into this inquiry. Second, without the introduction of any evidence indicating the overall volume of phone calls received by Plaintiff, it is difficult to determine what percentage the misdirected calls represent or to place the misdirected calls in their proper context.

185. Thus, though the Court deems the record evidence sufficient to prove some evidence of actual confusion amongst consumers, the <u>Lapp</u> factors concerning actual confusion tilt only slightly in Plaintiff's favor due to the Court's inability to evaluate the evidence in context.

**Fifth Factor – Defendant's Intent To Cause Confusion**

186. "[E]vidence of intentional, willful and admitted adoption of a mark closely similar to the existing mark[ ] weighs strongly in favor of finding [a] likelihood of confusion." <u>Checkpoint</u>, 269 F.3d at 286 (quotation omitted). This inquiry extends beyond asking whether a defendant purposely chose its mark to "promot[e] confusion and appropriat[e] the prior user's good will." <u>Fisons Horticulture, Inc.</u>, 30 F.3d at 479 (quotation omitted).

187. "The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant." <u>Kos Pharms, Inc.</u>, 369 F.3d at 721. <u>See e.g.</u>, <u>id.</u> at 721-22 (concluding that Defendant's choice to use the arbitrary, made-up trade-name, ALTOCOR with clear

notice of Plaintiff's objections and Plaintiff's successful prior use of the similar mark ADVICOR for similar goods "was at least reckless [and at worst a deliberate appropriation of the goodwill [Plaintiff] had generated for its . . . product").

188.   When analyzing this factor, the Court should assess whether the defendant intended to confuse the consumer as to the source of its goods. A & H Sportswear, Inc., 237 F.3d at 225-26. Intent merely to copy the plaintiff's mark is not enough to support an inference of confusion. Id.

189.   Defendant claims it only learned about Plaintiff's mark "A Taste of Philadelphia" in 2005 when he received a phone call purportedly from Mr. Della Barba. That Plaintiff's mark was already in existence well before this time suggests that Defendant did not conduct an adequate name search prior during the course of developing its business.

190.   Testimony at trial concerning Defendant's attempts to enter into a co-existence agreement with Plaintiff further suggests that at least by year 2005, Defendant knew of Plaintiff's existence and was aware of potential issues concerning potential similarity or marketplace confusion with Defendant's mark.

191.   These facts support a finding that, at a minimum, Defendant's failure to conduct a thorough investigation was careless.

192.   Nonetheless, the Court is not convinced that Defendant intended to confuse consumers as to the source of its pretzels or products when it began its operations. Nor is the Court convinced that Defendant set out to capitalize on the goodwill generated by Plaintiff's mark.

193.   The Court's conclusion that Defendant's conduct in this matter does not necessarily rise

to the level of willfulness or even recklessness to prove intent to cause confusion with Plaintiff's mark is bolstered by the facts that the parties' marks are not substantially similar in sight, sound or meaning; the products offered by the parties do not share significant overlap; and parties' targeted consumer base is different, particularly in light of the manner in which the goods are marketed and the price points at which the goods are sold; and the fact that several other food-related businesses and ventures using marks containing the phrase "A Taste of Philadelphia" exist.

194. As such, the Court finds that this <u>Lapp</u> factor neither tilts in favor or Plaintiff or Defendant.

**Factor Seven – Plaintiff and Defendants' Goods Are Marketed In Different Channels.**

195. The seventh factor for this Court to consider is whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media. <u>Strike Holdings LLC v. UC Strikes</u>, LLC, 2005 U.S. Dist. LEXIS 15398, at *25.

196. "[T]he greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." <u>Checkpoint</u>, 269 F.3d at 288-89 (quotation omitted). This is a "fact intensive inquiry" that requires a court to examine the "media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers." <u>Id.</u> at 289.

197. "[N]either customer sophistication nor the relationship between the goods is relevant to determining whether the goods are 'marketed through the same channels and advertised through the same media.'" <u>Kos Pharms, Inc.</u>, 369 F.3d at 722 (citing <u>Lapp</u>, 721 F.2d at

463).

198.    Both Plaintiff and Defendant advertise their products in newspapers and magazines, but the similarities in their marketing efforts stop there.

199.    Defendant occasionally targets local audiences by advertising in community newspapers.

200.    Plaintiff's advertising efforts have included placements in Philadelphia Magazine, philly.com, Delaware Valley Magazine, Town Talk magazine and with cab companies. Plaintiff has also appeared on talk shows.  Defendant has not done either.

201.    In addition to radio and print advertisements, Plaintiff  has been the lead sponsor in an annual food festival for the city of Philadelphia entitled "A Taste of Philadelphia."  The record does not indicate that Defendant has advertised its business by sponsoring events.

202.    Unlike Defendant, the Plaintiff has been the subject of numerous nationally published newspaper articles over the years, including in the Associated Press and other news wire services, providing nationwide publicity for its food distribution services.

203.    Though for some time, both Plaintiff and Defendant had an internet presence, there was still a marked difference in their online approaches.  Plaintiff relies heavily on internet orders for its business model and the overnight shipping of orders while Defendant does not sell pretzels over the internet and does not ship its products through the mail.  Until recently, Defendant's online presence was designed to advertise its franchise business on websites like www.franchisegator.com.[5]

204.    Based on the foregoing distinctions in the parties' advertising and marketing campaigns,

---

[5]  With respect to Defendant's retail outlets, individual franchises perform their own advertising and use a variety of local media outlets.

the Court concludes that this <u>Lapp</u> factor does not favor Plaintiff.

**Factor Eight - The Targets of the Parties' Sales Efforts Are Not the Same.**

205.    In evaluating this factor, Courts look at whether the "parties target their sales efforts to the same consumers." <u>Checkpoint</u>, 269 F.3d at 289.

206.    Plaintiff's target audience are those consumers seeking to spend between $50.00 to $300.00 on a gift package containing Philadelphia area food products to individuals across the country. Plaintiff primarily seeks Internet customers across the country and does not solicit walk-up traffic.

207.    In contrast, Defendant's target audience is local customers that seek an inexpensive snack food at one of its retail stores or seek to use the store to host birthday parties. Defendant occasionally targets local audiences by advertising in community newspapers, but Defendant does not sell its product over the Internet. Rather, Defendant concentrates its marketing sales efforts on walk up customers.

208.    In comparing the target audience of both parties, it is clear that the targets of their sales efforts share little, if any, similarity.

209.    Accordingly, this factor does not weigh in favor of Plaintiff.

**Factor Nine - The Relationship of the Goods in the Minds of the Public Are Not Similar.**

210.    "The closer the relationship between the products, ... the greater the likelihood of confusion." <u>Lapp</u>, 721 F.2d at 462. "The question is how similar, or closely related, the products are." <u>Kos Pharms., Inc.</u>, 369 F.3d at 723; <u>Fisons Horticulture, Inc.</u>, 30 F.3d at 481 (describing cases where "the relationship of the products was close enough to lead to the likelihood of confusion" and "the goods were similar enough that a consumer could

assume they were offered by the same source").

211. This factor focuses on the nature of the products themselves, asking whether it would be reasonable for consumers to associate them or see them as related. Courts have recognized that "the near-identity of the products" or their "similarity of function" are key to assessing whether consumers may see them as related. <u>Kos Pharms., Inc.</u>,369 F.3d at 723 (finding that both parties' prescription drugs, Advicor and Altocor, were used by patients to improve cholesterol levels and as such the products were of the same type and served the dame function).

212. Courts may consider"whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source[,] affiliation or sponsorship." <u>Checkpoint</u>, 269 F.3d at 286.

213. Plaintiff failed to provide any evidence that the public considers the products sold by "A Taste of Philadelphia" to be synonymous with the products sold by "A Taste of Philly" Hand Twisted Soft Pretzel Bakery.

214. Given the difference between the parties' actual product offerings and modes of marketing (i.e., Plaintiff's sale and marketing of gift packages of Philadelphia styled food products over the Internet and Defendant's sale and marketing of fresh hand-made pretzels at a neighborhood pretzel bakery), the Court finds that the consumers of the parties' products are unlikely to reach such a conclusion.

215. For the same reasons, the parties' consumers are unlikely to encounter the goods of the other.

216. As previously discussed, the parties' products are not similar in function. Plaintiff sells

gift baskets of prepackaged food items native to Philadelphia at price points ranging from approximately $50.00 to $300.00 to individuals mainly outside of the Philadelphia area. Defendant sells fresh baked pretzels to walk-up customers at its retail stores at an average price point of less than $5.00.

217. These distinctions do not support the conclusion that there would be an assumption of common source or affiliation between the parties' products in the minds of the public.

218. Thus, this Lapp factor does not favor Plaintiff.

**Factor Ten – Other Factors Suggesting that the Consuming Public Might Expect the Prior Owner to Manufacture a Product in the Defendants' Market.**

219. "In assessing this factor, courts may look at the nature of the products or the relevant market, the practices of other companies in the relevant fields, or any other circumstances that bear on whether consumers might reasonably expect both products to have the same source. This issue is highly context-dependent." Kos Pharms., Inc., 369 F.3d at 724.

220. Plaintiff's market is broad based and national due to its concentration on Internet sales and the type of likely consumer, an individual who desires food native to Philadelphia, but does not have ready access to such food items. In contrast, Defendant's market is localized and concentrated on local consumers that walk up to its retail stores in the regional area. These facts do not create a likelihood of confusion as the source of the parties' products.

221. Moreover, the parties products are different and price points are different. Plaintiff sells gift baskets of prepackaged food items native to Philadelphia at price points ranging from approximately $50.00 to $300.00 to individuals mainly outside of the Philadelphia area.

Defendant sells fresh baked pretzels to walk-up customers at its retail stores at a price point of less than $5. These facts also do not create a likelihood of confusion as to the source of the parties' products.

222.  For these reasons, and other reasons already discussed, the Court finds that this <u>Lapp</u> factor does not favor Plaintiff.

**B. WEIGHING THE LAPP FACTORS**

223.  Once each of the relevant <u>Lapp</u> factors has been considered, the district court must balance the factors and "determine whether in the totality of the circumstances marketplace confusion is likely." <u>Checkpoint</u>, 269 F.3d at 296.

224.  An analysis of the <u>Lapp</u> factors in this matter leads to a conclusion that weighs against finding a likelihood of confusion between the parties' marks.

225.  The two factors concerning actual confusion favor Plaintiff. The Court reached this conclusion based on the fact that the parties' marks have coexisted for several years and during that time there has been some evidence of actual confusion based on misdirected calls. But, for reasons already discussed, the Court assessed little probative value to this evidence and noted that factors (4) and (6) only slightly favor Plaintiff.

226.  With respect to the intent to deceive factor, factor (5), the Court concluded that this factor did not favor either party.

227.  All of the remaining <u>Lapp</u> factors favor Defendant and the overall conclusion that Defendant's mark is not likely to cause confusion with Plaintiff's mark. This includes the most important factor, mark similarity. The marks of the parties are dissimilar in that they do not share the same sight, sound or meaning.

228. Additionally, Plaintiff's mark "A Taste of Philadelphia" is a descriptive term that customers do not associate with a particular product.  Plaintiff's mark is weak both conceptually and commercially.  There is little to no overlap between the parties' target consumers and the degree of care each parties' customer base uses in making purchasing decisions is different enough as to not support a finding of confusion.  The parties' products are marketed and sold to different audiences employing different marketing strategies.  Plaintiff depends on the Internet for the bulk of its revenues while Defendant does not conduct any sale transactions over the Internet.  The products made by the parties, gift packages of Philadelphia foods and sundry items by Plaintiff and fresh hand twisted pretzels by Defendants are not products customers would expect to come from a single source.  Finally, the parties' products have markedly different price points.

229. Thus, based on the totality of the circumstances, the Court concludes that there is no likelihood of confusion between Plaintiff's and Defendant's mark.

## C.  PLAINTIFF FAILED TO ESTABLISH GROUNDS FOR INJUNCTIVE RELIEF

230. Trademark infringement amounts to irreparable injury as a matter of law.  S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 378 (3d Cir. 1992).

231. Because Plaintiff failed to establish a likelihood of confusion between the parties' marks as shown above, Plaintiff cannot prevail on its federal claim for trademark infringement and unfair competition under the Lanham Act or its identical state law claim.

232. Accordingly, Plaintiff has failed to establish that it suffered irreparable harm and an

injection would be improper.[6]

## D. CONCLUSION

233.    For the foregoing reasons, the Court concludes that Defendants did not infringe on

Plaintiff's mark.  Nor are Defendants liable for any of the other claims alleged.  An

appropriate Order follows.

---

[6]    The Court notes that, in addition to the above-mentioned claims, Plaintiff's Complaint also alleged a federal claim for service mark dilution in violation of 15 U.S.C. § 1125(c)(1), a state claim for injury to business reputation and service mark dilution in violation of 54 Pa. C.S.A. § 1125 and a claim for cyberpiracy in violation of 15 U.S.C. § 1125(d).  It appears as though Plaintiff has abandoned these claims as Plaintiff did not brief any of these claims in its pre-trial memorandum, did not present oral argument addressing these claims during the bench trial, and did not submit conclusions of law pertaining to these claims in its post-trial briefs.  That said, based on the Court's analysis of the findings of fact presented supra, the Court finds that Plaintiff has failed to meet the burden of proof required to find Defendants liable for any of these claims.

        To recover under the Federal Trademark Dilution Act (FTDA), the plaintiff must prove: (1) the plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of eight statutory factors; (2) the defendant is making commercial use in interstate commerce of a mark or trade name; (3) defendant's use began after the plaintiff's mark became famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.  See 15 U.S.C.A. § 1125(c)(1); Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C., 212 F.3d 157 (3d. Cir. 2000).  Here, Plaintiff has not demonstrated that its mark qualifies as famous, particularly given that Plaintiff's mark lacks inherent strength; Plaintiff's mark has not gained a secondary meaning in its marketplace; Plaintiff has not expended significant resources on advertising its business; and the record shows that similar marks are used by several third parties.

        Pennsylvania's anti-dilution statute provides a ground for relief when the plaintiff proves a likelihood of injury to business reputation or of dilution of the distinctive quality of its mark as a result of the defendant's conduct or use of a secondary mark.  See 54 Pa.C.S. § 1124.  To recover, the plaintiff must prove that its mark has acquired a secondary meaning and has a degree of distinctiveness and strength beyond that needed to serve as a trademark.  See Patient Transfer Systems, Inc. v. Patient Handling Solutions, Inc., 1999 WL 54568, at *8 (E.D. Pa. 1999).  For reasons previously discussed, Plaintiff has not met this burden.

        To recover on a claim for cyberpiracy, the plaintiff must prove that (1) it had a distinctive or famous mark at the time the domain name was registered, (2) the defendant registered, trafficked in, or used a domain name that is identical or confusingly similar to plaintiff's mark, and (3) the defendant had a bad faith intent to profit from that mark.  See 15 U.S.C. § 1125(d); V'soske, Inc. v. Vsoske.com, No. 00 CIV. 6099(DC), 2001 WL 546567, at *6 (S.D.N.Y. May 23, 2001).  Here, Plaintiff did not prove that its mark was famous, nor did Plaintiff prove that Defendants had any bad faith intent to profit from Plaintiff's mark.